IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

CLERKS OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED
6/24/2024
LAURA A. AUSTIN, CLERK
BY: s/ Christel Kemp
DEPUTY CLERK

| | | |
|---|---|---|
| JOYCE BOLENDER, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 7:23-cv-00245 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| BIO-MEDICAL APPLICATIONS OF | ) | By:   Hon. Thomas T. Cullen |
| VIRGINIA, INC. & FRESENIUS USA | ) |      United States District Judge |
| MANUFACTURING, INC. d/b/a | ) | |
| FRESENIUS MEDICAL CARE | ) | |
| NORTH AMERICA, | ) | |
| | ) | |
| Defendants. | ) | |

Plaintiff Joyce Bolender brought suit against Defendants Bio-Medical Applications of Virginia, Inc. ("BMA") and Fresenius USA Manufacturing, Inc. d/b/a Fresenius Medical Care North America ("Fresenius Manufacturing" and, together with BMA, "Defendants"), alleging Defendants' termination of her employment constituted age discrimination in violation of (1) the Age Discrimination in Employment Act of 1967 ("ADEA") and (2) the Virginia Human Rights Act ("VHRA"). The matter is now before the court on Defendants' motion for summary judgment. For the reasons discussed below, the court will grant the motion as to Bolender's VHRA claim, but deny it in all other respects.

# I.   STATEMENT OF FACTS

The following facts are either undisputed or presented in the light most favorable to Bolender, the nonmoving party.[1] *See Glynn v. EDO Corp.*, 710 F.3d 209, 213 (4th Cir. 2013) (citing *Bonds v. Leavitt*, 629 F.3d 369, 380 (4th Cir. 2011)).

## A. Corporate Structure

Because the parties dispute what entities were Bolender's employers, this section summarizes aspects of Defendants' corporate form that were pertinent to Bolender's previous employment as a social worker at the Fresenius Kidney Care dialysis center in Salem, Virginia.

Each Defendant is an indirect, wholly-owned subsidiary of Fresenius Medical Care AG & Co. KGaA (ECF Nos. 9–10), which, through its worldwide affiliates and subsidiaries (collectively, "Fresenius"), runs dialysis clinics that treat patients with kidney disease. (Bost Decl. ¶¶ 3–5 [ECF No. 24-2]; Disciplinary Guideline at 1–2 [ECF No. 25-4].) Fresenius uses a number of different names for both its internal and external operations.

---

[1] Defendants assert that Bolender did not object to or dispute their summary judgment brief's "Statement of Undisputed Material Facts," so the court must accept Defendants' proffered facts as true. (Reply Br. at 3–4 [ECF No. 29].) That is incorrect. Bolender did not provide pointed objections to each of the 52 paragraphs in Defendants' statement of facts—as may have been best practice—but she did "very much dispute[]" Defendants' facts and set forth, in detail and with citations to the record, evidence that demonstrates genuine issues of material facts. (*See* Pl.'s Br. at 3–13 [ECF No. 25].) Unlike some other courts in the Fourth Circuit, this court's local rules do not require a party to follow a specific format when disputing facts in a summary-judgment response brief. *Compare* W.D. Va. Local Civ. R. 56, *with* E.D. Va. Local Civ. R. 56 (requiring that a response brief *list* all material facts that are disputed). Additionally, although Bolender's response does not identify the disputed evidence on a point-by-point basis, the court does not simply accept Defendants' facts given that the record provided as part of both Defendants' motion and Bolender's response shows, on its face, genuine factual disputes on key items. *See* Fed. R. Civ. P. 56(e)(2) advisory committee's note to 2010 amendments ("[T]he court may choose not to consider [a] fact as undisputed, particularly if the court knows of record materials that show grounds for genuine dispute."). At bottom, the fact section in Bolender's response brief did not meaningfully affect Defendants' ability to address her response, as indicated by their thorough reply brief, or the court's ability to resolve the instant motion. *Cf. Dixon Lumber Co., Inc. v. Austinville Limestone Co. Inc.*, 256 F. Supp. 3d 658, 666–67 (W.D. Va. 2017). The court, therefore, does not treat Defendants' statement of facts as undisputed, and instead considers the totality of the evidence submitted by both parties.

Internally, policy documents refer to the company as, among other things, "Fresenius Medical Care North America," "Fresenius Medical Care," and "FME." (*See, e.g.*, Bost Decl. Exs. A–B; Disciplinary Guideline.) Some employee email signatures display "Fresenius Kidney Care." (*See* Bost Decl. Ex. E.) And some clinic supplies are labeled with "Fresenius USA Manufacturing." (Bolender Dep. 52:4–6 [ECF No. 25-3].) Bolender's W-2s similarly reflect multiple Fresenius entities. Her 2020 W-2 notes "Bio-Medical Applications of Virginia, Inc." as her employer, but her 2021 and 2022 W-2s state that her employer was "Fresenius Management Services, Inc." (ECF No. 24-5 at 41–43.)

Externally, Fresenius is also known by several names. For example, the company advertises to the public that its dialysis centers function as "part of Fresenius Medical Care North America (FMCNA) . . . [and] may be known as Fresenius Kidney Care or Fresenius Medical Care, as well as other names." (ECF No. 25-6 at 2.) One of those other names, according to Bolender, is "Fresenius Renal Care." (Bolender Dep. 49:7–8, 221:3–5.)

Virginia's State Corporation Commission ("SCC") sets forth even more names associated with Fresenius. Of note, the SCC lists "Fresenius USA Manufacturing, Inc." as a legal entity registered to do business in Virginia. (ECF No. 25-7.) The SCC's records further show that "Fresenius Medical Care North America" is one of Fresenius Manufacturing's fictitious names but not a standalone entity. (*Id.*) "Fresenius Management Services, Inc.," the employer listed on Bolender's 2021 and 2022 W-2s, is not registered with the SCC as either a legal entity or fictitious name. (*Id.*; *see also* Bolender Dep. 238:17–240:1.)

## B.  Bolender's Employment and Termination

Bolender worked at Fresenius from November 3, 2014, until October 24, 2022. (Foley Dep. 26:2–4 [ECF No. 25-1]; Foley Decl. ¶ 18 [ECF No. 24-4].) Megan Foley both recruited Bolender to join the company and fired her eight years later. (Bolender Dep. 19:18–20:16; Foley Decl. ¶ 18.) Bolender was 81 years old when her employment was terminated. (Bolender Dep. 195:2–4.)

As a social worker at Fresenius, Bolender "provid[ed] services, support, and education to patients and their famil[ies]." (Foley Decl. ¶ 7.) She also collaborated with multiple members of patients' care teams (*e.g.*, doctors, nurses, and dieticians) to treat Fresenius patients. (Bolender Dep. 85:6–89:21.) Bolender's responsibilities included assessing patients' eligibility for kidney transplants and completing documentation for their files. (Foley Decl. ¶ 7.) One such document was the transplant assessment form. Bolender completed this form after her initial meeting with a patient and updated it quarterly to reflect the patient's medical status and eligibility for a transplant. (*Id.* ¶¶ 8–9.) Before completing the quarterly update, Bolender was expected to confirm the patient's status with the patient, one of the patient's family members, the transplant center, or a member of the care team. (*Id.* ¶ 8.)

Bolender performed well as a social worker at Fresenius. She was never disciplined prior to her termination (Foley Dep. 50:20–51:5), and her performance evaluations reflected "many glowing comments," along with certain areas of opportunity, "that show[ed] she [was] an asset to the team" (Foley Decl. at 28). Foley authored many of those plaudits as Bolender's manager. Among myriad positive remarks in her 2019 annual review, for example, Foley said that Bolender was generous, thoughtful, and built trust with patients. (*Id.* at 69.) In her 2020

review, Foley appreciated Bolender's positive team attitude, believed she collaborated well with others, and "look[ed] forward to working with [Bolender] for years to come." (*Id.* at 70–71, 75.) Foley also admired Bolender's desire to learn, despite her admitted weakness with technology, and believed her "documentation [was] strong." (*Id.* at 75.) In Bolender's 2021 evaluation, her last full-year evaluation before being fired, Foley stated that Bolender is "excellent" at documentation and that she was "privileged" to have Bolender on her team. (*Id.* at 82.) In Bolender's mid-year performance check-in on August 2, 2022, Foley noted that Bolender "collaborates well" with her patient care teams (*i.e.*, interdisciplinary teams) and "remains competent in documentation." (*Id.* at 83–84.) To this day, Foley believes that Bolender was a good employee. (Foley Dep. 24:4–5.)

Dalesha Gholson—an individual in her 20s—is another Fresenius social worker relevant to this case. (Gholson Dep. 6:21–7:9 [ECF No. 25-2].) Gholson remotely covered the clinic at which Bolender worked in June 2022 while Bolender was on a short leave of absence. (*See id.* 10:19–11:3, 30:6–11; Foley Decl. ¶ 15.) While providing that coverage, Gholson updated a patient's transplant assessment and marked that the patient was over the age of 75, making him ineligible for a transplant. (Gholson Dep. 10:2–11:18.) Gholson's update, however, was erroneous because the patient died more than a month earlier and had been only 59 years old. (*See id.* 32:22–33:19; Foley Dep. 205:20–206:3.) Her assessment was further flawed because its "date of discussion" field listed the date when Gholson updated the form in June 2022, but she did not discuss the patient's health status with anyone on, or prior to, that date. (Gholson Dep. 11:20–16:3.) Gholson instead relied on the information from

Bolender's previous patient assessment to complete the June update. (*Id.* 31:22–32:6; Foley Dep. 206:4–16; Foley Decl. at 110–15.)

After discovering Gholson's mistakes, Foley marked the June transplant assessment "erroneous" so that no one but Fresenius's IT team could view it going forward. (Foley Dep. 35:10–37:16, 181:11–12.) By doing so, Foley ensured that the inaccurate assessment would not remain a part of the patient's record, making it inaccessible to government or transplant agencies who audit patient files, which mitigated Fresenius's potential compliance penalties. (*See* Foley Dep. 35:10–37:16; Brown Decl. ¶ 6 [ECF No. 24-3].)

Foley also notified Fresenius's human resources department ("HR") of Gholson's error. (Foley Decl. at 92.) HR responded that it considered Gholson's actions "falsification of documentation" and generally recommend termination in such situations. (Bost Decl. at 107.) But that recommendation was apparently perfunctory because HR always suggests termination so that it can say as much if the issue is ever raised during a deposition. (*Id.* at 131.) In practice, HR deferred to Fresenius's management—Foley; her supervisor, Kenya Brown; and Brown's supervisor, Anne Campbell—about how they wanted to proceed with Gholson. (*See id.* at 109, 131; Foley Dep. 107:15–108:3–4.)

Although Gholson had only worked at Fresenius for about a year at the time of her error, Foley considered her an excellent employee and expressed a desire to "retain her through any means necessary." (Bost Decl. at 107, 110.) Brown agreed and considered Gholson's actions "more of a documentation error rather than falsification." (*Id.* at 112, 122.) Campbell also supported keeping Gholson, and HR noted that retaining her would be consistent with a case from the previous year when Fresenius kept an employee with

"similar . . . but more widespread" documentation issues. (*Id.* at 119–20.) HR and the management team further agreed that the transplant assessment form was confusing and should be revised because it was setting up social workers for failures. (*See id.* at 122, 131–32; Foley Dep. 88:10–90:21.) One particular part of the form that they viewed as misleading was the "date of discussion" field. (Bost Decl. at 131.) Ultimately, Gholson kept her job without even receiving a disciplinary write-up. (*Id.* at 122; Foley Dep. 38:10–13.)

Following Gholson's error, Brown hosted a documentation training for Fresenius social workers in August 2022. (Brown Decl. ¶ 13.) Bolender missed the training. (*See* Foley Dep. 72:20–74:17.) No one mentioned her absence until she was terminated. (Bolender Dep. 63:19–64:21.)

Two months later, on October 3, 2022, the events that culminated in Bolender's termination began when Foley directed her to update a specific patient's transplant assessment. (*Id.* 125:14–15.) Bolender had returned to work from a weeklong vacation that same day. (*Id.* 127:18–20, 243:22–244:1.) She was confused by Foley's request because she completed a transplant assessment on the requested patient in August, at which time medical concerns caused her to not refer the patient for a transplant; the patient's next quarterly update was not due until mid-November according to Fresenius's typical practice. (*Id.* 125:15–20, 156:12–19; ECF No. 24-5 at 48; Foley Dep. 116:12–117:6.)

Still, Bolender followed Foley's order and asked a nurse about meeting with the patient at the dialysis clinic later that day. The nurse informed Bolender that would not be possible because the patient was in the hospital. (Bolender Dep. 126:5–127:12, 143:3–144:18.) Bolender claims that Fresenius's policies dictated that nurses, not social workers, were responsible for

obtaining patient's medical information; accordingly, Bolender did not call the hospital to verify the nurse's statement or find out why the patient was there. (*Id.* 130:19–132:6.)

A week after her conversation with the nurse, Bolender updated the patient's transplant assessment. (ECF No. 24-5 at 48.) The updated assessment—like Gholson's erroneous June 2022 assessment—listed the "date of discussion" as the day Bolender revised the form, October 10, even though Bolender did not speak to anyone on that date. (*Id.*; Bolender Dep. 119:6–120:5, 124:14–17.) It also noted "no new information" in the comment section because, based on Bolender's discussion with the nurse, she had no new information about the patient's status for a transplant: the patient remained ineligible. (*See* Bolender Dep. 148:6–12.) To Bolender, this comment and the date-of-discussion field reflecting October 10 were innocuous. The comment section was "irrelevant to the assessment" and could be left blank, and the date of discussion typically reflected when a social worker completed an assessment, not the actual day a social worker discussed a patient's status with someone. (*See id.* 38:2–9, 135:2–136:5, 147:2–17, 160:17–20.)

Unbeknownst to Bolender, however, the patient had died on October 1, two days before the nurse told Bolender that the patient was still in the hospital. (*Id.* 182:5–17.) No one shared that information or contradicted the nurse's representations before Bolender updated the assessment on October 10. Bolender, therefore, followed the customary practice of Fresenius social workers and relied on the most recent information she had from the patient's care team—the October 3 statement from the nurse—when revising the patient's file. (*See generally id.* 103:12–114:10, 130:19–131:13 (describing her typical practices); *see also* Gholson

Dep. 12:5–14:8 (supporting that Fresenius social workers relied on nurses for patient information needed to complete transplant assessments).)

On October 13, Foley informed Bolender of her mistake and directed her to mark the assessment erroneous. (Foley Decl. ¶ 11.) Following the spirit, but not letter, of Foley's directive, Bolender revised her comments on the patient's transplant assessment to the following: "10/10/22: no new information*(error) 10/13/22: Patient died 10/1/22.*" (*Compare* Bost Decl. at 51, *with* Bost Decl. at 57 (emphasis added to show the revisions); *see* Foley Dep. 101:18–102:22.) Foley was upset by Bolender's actions because the revised assessment acknowledged the mistake and remained visible in the patient's file. (Foley Dep. 103:1–14.) Although Foley could have solved this issue by marking the assessment erroneous herself— as she did with Gholson's June assessment (*id.* 181:11–12)—she chose not to do so for Bolender. (*Id.* 103:17–104:11.)

The next day, on October 14, Foley informed HR of Bolender's error, and HR responded in its default manner: it considered the mistake "falsification of documents" so Bolender may be terminated. (*See* Bost Decl. at 25.) In sharp contrast to Gholson's case, Foley and Brown did not go to bat for Bolender after receiving HR's response. Instead, they emphasized that Bolender had participated in Brown's August documentation training (*id.* at 26–27), which discovery revealed was not true (Foley Dep. 73:7–74:17). Foley also indicated she wanted to defer to HR on what to do (Bost Decl. at 27); based on Gholson's case, Foley knew, or should have known, deferring to HR would result in a termination recommendation. Most glaringly, unlike for Gholson, neither Foley nor Brown advocated for Bolender as an

excellent employee or expressed a desire to keep her "by any means necessary." (*See* Foley Dep. 171:16–173:13.)

Campbell, on the other hand, provided some resistance against the momentum to terminate Bolender. She expressed comfort that Bolender merely wrote "no new information" on the October 10 assessment, and she did not believe the error amounted to falsification of documents. (Bost Decl. at 28, 35.) She also pointed out that the transplant assessment form remained confusing when Bolender made her mistake. (*Id.* at 35.) No one responded to these concerns. (*See id.* at 38; Foley Dep. 124:18–125:4.)

Subsequently, HR and Foley had a call to discuss Bolender's case, in which Campbell did not participate. (*See* Foley Dep. 124:18–125:21, 129:8–13; ECF No. 25-17 at 3.) Following the call, HR officially recommended terminating Bolender. (Foley Dep. 124:18–125:21; Bost Decl. at 49.) The recommendation went against Campbell's opinion, which she reiterated to Foley and HR on October 20.[2] (*See* Foley Dep. 129:4–13.) The recommendation also stood in opposition to Fresenius's progressive discipline policy that emphasizes consistency, fairness, and escalating punishments prior to termination. (*See id.* 39:19–46:5; Disciplinary Guideline.) At her deposition, Foley indicated that Bolender was ostensibly a prime candidate for a form of discipline significantly less than termination because a number of the policy's mitigating factors applied to Bolender's situation, including that it was her first offense. (*See* Foley Dep. 50:20–63:18.)

---

[2] Interestingly, Campbell filed a declaration after the close of discovery in which she claims to have revised her initial view and "determined that Ms. Bolender's conduct constituted falsification of documentation" after further review and discussions with HR. (Campbell Decl. ¶ 15 [ECF No. 24-1].)

Nonetheless, the termination proceeded, and on October 24, 2022, Foley fired Bolender for falsification of documentation. (Foley Decl. ¶ 18.) Upset by this news, Bolender brought in her former supervisor, Mary Beth Romeo, for the second half of the meeting. (*Id.*; Bolender Dep. 46:5–6, 185:2–7.) Both Bolender and Romeo accused Foley of firing Bolender because of her age. (Foley Decl. ¶ 18; Bolender Dep. 189:1–191:4.) Other employees also filed HR complaints expressing concerns about Foley firing Bolender. (Foley Dep. 156:5–162:22; ECF No. 25-19.) Fresenius's management and HR deny that they did anything wrong.

Following the termination, an employee who was "a lot younger" than Bolender took over her position, while Bolender "looked everywhere" for work. (Bolender Dep. 28:17, 187:6–9.) Bolender's efforts included going to an "employment office" and "call[ing] two companies a week to try to find a job." (*Id.* 28:8–20.) She applied to a number of non-dialysis companies with marginal success and briefly worked as a social worker at a jail before quitting because the job was not what she expected. (*Id.* 208:11–216:4.) She also declined other opportunities that did not fit her schedule. (*Id.* 215:8–16.) Eventually, Bolender settled on working as an independent contractor for two telehealth companies. (*Id.* 24:13–15, 24:21, 27:9.) Bolender currently works two days per week for at most 10 hours and is not seeking full-time employment. (*Id.* 24:21–27:21.) Much of her time is now filled with medical appointments, housework, exercise, and adjusting to a more austere lifestyle. (*Id.* 27:12–17, 29:6–13.)

Approximately six months after she was fired, on May 1, 2023, Bolender filed suit in this court. Discovery closed last month, and, less than 10 days later, Defendants filed their motion for summary judgment on both counts in Bolender's complaint. Their motion also

asks that the court dismiss Fresenius Manufacturing as a party and strike Bolender's requests for punitive damages, back pay, and front pay. Bolender filed a response in opposition to the motion on June 7, and Defendants replied on June 14. Having reviewed the pleadings, briefs, and record, the motion is now ripe for decision.[3]

## II.    STANDARD OF REVIEW

Under Rule 56(a), the court can only "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Glynn*, 710 F.3d at 213. When making this determination, the court considers "the pleadings, depositions, answers to interrogatories, and admissions on file, together with [any] affidavits" filed by the parties. *Celotex*, 477 U.S. at 322. Whether a fact is material depends on the relevant substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* (citation omitted). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. If that burden has been met, the nonmoving party must then come forward and establish the specific material facts in dispute to survive summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986).

In determining whether a genuine issue of material fact exists, the court must view the facts and draw all reasonable inferences in the light most favorable to the nonmoving party.

---

[3] The court dispenses with oral argument because it would not aid in the decisional process.

*Glynn*, 710 F.3d at 213. Indeed, "[i]t is an 'axiom that in ruling on a motion for summary judgment, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in [her] favor.'" *McAirlaids, Inc. v. Kimberly-Clark Corp.*, 756 F.3d 307, 310 (4th Cir. 2014) (internal alteration omitted) (quoting *Tolan v. Cotton*, 572 U.S. 650, 651 (2014)). Moreover, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson*, 477 U.S. at 255. The nonmoving party must, however, "set forth specific facts that go beyond the 'mere existence of a scintilla of evidence.'" *Glynn*, 710 F.3d at 213 (quoting *Anderson*, 477 U.S. at 252). It may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment. *See Baber v. Hosp. Corp. of Am.*, 977 F.2d 872, 874–75 (4th Cir. 1992).

## III. ANALYSIS

Bolender's VHRA claim fails as a matter of law, but genuine disputes of material facts preclude dismissing Fresenius Manufacturing as a defendant, granting summary judgment on Bolender's ADEA claim, or striking her requests for punitive damages, back pay, and front pay.

### A. VHRA Claim

Bolender did not address Defendants' VHRA arguments in her response brief, so the court will grant Defendants summary judgment on this claim.[4] *See, e.g., Gowen v. Winfield*, No.

---

[4] The court also agrees with Defendants that they are not "employers," and therefore not liable, under the VHRA because they employ more than 19 people. *See* Va. Code Ann. § 2.2-3905 ("[F]or purposes of unlawful discharge . . . on the basis of age, 'employer' means any employer employing more than five but fewer than 20 persons.").

7:20-cv-00247, 2022 WL 822172, at *3 (W.D. Va. Mar. 18, 2022) (collecting cases for the proposition that a party's failure to respond to an argument in a dispositive motion results in concession of that claim).

## B. Defendants as Bolender's Integrated Employer

Defendants contend that the court should dismiss Fresenius Manufacturing as a party to this case because it did not employ Bolender. (Defs.' Br. at 14.) Bolender counters that both BMA and Fresenius Manufacturing employed her as an integrated employer, so Fresenius Manufacturing is a proper defendant. (Pl.'s Br. at 20–22.) The court agrees with Bolender at this stage.

In lawsuits alleging violations of the ADEA, several corporate entities can be treated as an "integrated employer" of the plaintiff if the entities are "so interrelated that they constitute a single employer." *Hukill v. Auto Care, Inc.*, 192 F.3d 437, 442, 442 n.6 (4th Cir. 1999), *abrogated on other grounds by Arbaugh v. Y & H Corp.*, 546 U.S. 500 (2006). If an entity "is deemed to be part of a larger 'single-employer' entity," it can be liable for ADEA violations even if another entity technically employs the plaintiff on its books. *See Wright v. Mountain View Lawn Care, LLC*, No. 7:15-cv-00224, 2016 WL 1060341, at *7 (W.D. Va. Mar. 11, 2016) (quoting *Arculeo v. On-Site Sales & Mktg., LLC*, 425 F.3d 193, 198 (2d Cir. 2005)). In other words, "a defendant that does not directly employ the plaintiff may still be considered an employer under" the ADEA. *Hukill*, 192 F.3d at 442. Although the integrated-employer test typically involves a parent and subsidiary, it is also applicable to "separate corporations that operate under common ownership and management." *Tarwaab v. Va. Linen Serv., Inc.*, 729 F.

- 14 -

Supp. 2d 757, 770 (D. Md. 2010); *see also E.E.O.C. v. Everdry Mktg. & Mgmt., Inc.*, No. 01-cv-6329, 2005 WL 231056, at *6 (W.D.N.Y. Jan. 31, 2005) (collecting cases).

To determine if two entities are part of an integrated employer, the court considers the following factors: "(1) common management; (2) interrelation between operations; (3) centralized control of labor relations; and (4) degree of common ownership/financial control." *Hukill*, 192 F.3d at 442. None of the factors are dispositive, but the third factor is the most important. *Id.* Overall, courts apply the factors to decide "what entity made the final decisions regarding employment matters related to the person claiming discrimination." *Id.* at 444 (cleaned up).

Applied here, each of the *Hukill* factors demonstrates that BMA and Fresenius Manufacturing were part of an integrated employer in connection with Bolender's job.[5] *See* 192 F.3d at 442. First, BMA and Fresenius Manufacturing shared common management of Bolender's role because the same management team—Campbell, Brown, and Foley—oversaw social workers at Fresenius Medical Care (*i.e.*, Fresenius Manufacturing), including social workers like Bolender who were technically employed on BMA's books. Policy documents referring to Fresenius Medical Care also controlled Bolender's work, even though she was purportedly only a BMA employee. Second, no evidence in the record distinguishes between the operations of BMA and Fresenius Medical Care, supporting that the entities' operations

---

[5] The record in this matter shows that Fresenius Manufacturing is the legal entity in Virginia behind the fictitious name "Fresenius Medical Care North America." (*See* ECF No. 25-7.) As such, for purposes of this motion, the court considers references to Fresenius Medical Care North America—and its shortened name, Fresenius Medical Care (*see, e.g.*, ECF No. 25-6)—as references to Fresenius Manufacturing. *See Snowden v. CheckPoint Check Cashing*, 290 F.3d 631, 634 n.2 (4th Cir. 2002).

were interrelated for Bolender's job. Third, the two entities had centralized labor relations, as evidenced by the management and HR teams of Fresenius Medical Care investigating, then terminating, Bolender. Fourth, Fresenius Manufacturing and BMA share common ownership: they are each indirectly, wholly-owned by Fresenius Medical Care AG & Co. KGaA.

Defendants' arguments that they should not be treated as an integrated employer are unavailing. They contend that Fresenius Manufacturing was not Bolender's employer because it was not listed on her W-2s. (Defs.' Br. at 14.) But an entity can be a plaintiff's integrated employer even if it is not shown on a tax form. *See Jarvis v. Chimes, Inc.*, No. CIV.A. RDB-06-1197, 2008 WL 623402, at *7 (D. Md. Mar. 4, 2008). Defendants also claim that Bolender never heard the name Fresenius Manufacturing during her employment and could not name anyone who worked for the entity. The former point is, at minimum, an issue of fact as Bolender stated that she saw supplies with the name Fresenius Manufacturing during her employment. (Bolender Dep. 52:4–6.) And the latter point is unconvincing because employees logically would refer to the employer's operating name, Fresenius Medical Care, rather than its legal name, Fresenius Manufacturing.

At bottom, the record related to Bolender's employment is replete with references to Fresenius Medical Care, creating a genuine issue of material fact about whether Fresenius Manufacturing, the underlying legal entity, was Bolender's integrated employer with BMA, the employer listed on her W-2. *See Jarvis*, 2008 WL 623402, at *7. Ruling otherwise would allow Fresenius Manufacturing to skirt liability through nothing more than fictitious naming practices and run contrary to the broad remedial purpose of civil rights statutes. *Cf. Magnuson v. Peak Tech. Servs., Inc.*, 808 F. Supp. 500, 508 (E.D. Va. 1992) ("[T]he broad, remedial purpose

of Title VII . . . militates against the adoption of a rigid rule strictly limiting 'employer' status under Title VII to an individual's direct or single employer."); *Lissau v. S. Food Serv., Inc.*, 159 F.3d 177, 180 (4th Cir. 1998) ("The Title VII definition of employer must be read in the same fashion as the ADEA definition of employer."). Accordingly, the court will deny Defendants' request to dismiss Fresenius Manufacturing as a party and will treat both Defendants as Bolender's employer for analyzing the merits of their summary-judgment motion.[6]

## C. ADEA Claim

Turning to Bolender's ADEA claim, the ADEA prohibits an employer from "discharg[ing] any individual . . . *because of* such individual's age." 29 U.S.C. § 623(a)(1) (emphasis added). Bolender, therefore, must prove that age discrimination was the but-for cause of her termination in order to succeed on her claim. *See Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177 (2009); *see also Palmer v. Liberty Univ., Inc.*, 72 F.4th 52, 63 (4th Cir. 2023) (cleaned up) ("An employee cannot prevail . . . by showing that age was one of multiple motives for an employer's adverse employment decision; the employee must prove that the employer would not have fired her in the absence of age discrimination."). "[T]he inquiry is whether discriminatory reasons animated or played a role in . . . and had a determinative influence on the employment decision." *Buckner v. Lynchburg Redev. & Hous. Auth.*, 262 F. Supp. 3d 373, 377 (W.D. Va. 2017) (cleaned up) (citing *Arthur v. Pet Dairy*, 593 F. App'x 211, 220 (4th Cir. 2015); *Gross*, 557 U.S. at 176).

---

[6] Although Fresenius Manufacturing is not entitled to dismissal at this stage, it should not be overly burdensome for the parties to determine who the proper defendants are in this action. The court encourages Bolender and Defendants to confer in good faith to stipulate as to which Fresenius entities were Bolender's employer to streamline what should be an uncontroversial issue at trial.

A plaintiff can prove age discrimination under the ADEA with direct evidence or through the burden-shifting scheme established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Palmer*, 72 F.4th at 63. Here, Bolender relies on the *McDonnell Douglas* framework and inference; she does not provide any direct evidence of age discrimination. (*See* Pl.'s Br. at 14–19.)

To demonstrate age discrimination based on *McDonnell Douglas*, Bolender must first establish a prima facie case of discrimination. If she does so, the burden shifts to Defendants to articulate a legitimate, nondiscriminatory reason for terminating Bolender. If Defendants clear that bar, Bolender must then prove Defendants' asserted justification is a pretext for discrimination. *See, e.g.*, *Westmoreland v. TWC Admin. LLC*, 924 F.3d 718, 725–26 (4th Cir. 2019).

### 1. Prima Facie Case

To establish a prima facie case of discrimination under the ADEA, Bolender must show that (1) she was at least 40 years old, (2) her job performance met her employer's legitimate expectations, (3) her employer nonetheless discharged her, and (4) a substantially younger individual replaced her. *Id.* at 725. "The burden at this stage is 'not onerous' . . . ." *Id.* (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). It is undisputed that Bolender satisfies the first and third elements because she was 81 years of age when Defendants fired her. The parties' dispute centers on the second and fourth elements.

On the second element, Defendants claim that Bolender's October 2022 error demonstrates her performance failed to meet their legitimate expectations. (Reply Br. at 14–15.) The record, however, belies this self-serving statement. Bolender's annual and mid-year

employment evaluations establish that she was a valued employee who received positive reviews from her manager, Foley. (*See* Foley Decl. at 28, 69–71, 75, 83–84.) This included Foley viewing Bolender as having strong documentation skills. (*Id.* at 75, 84.) Additionally, Defendants never disciplined Foley prior to her termination. (*See* Foley Dep. 50:20–51:5.) And Foley continues to believe that Bolender was a good employee. (*Id.* 24:4–5.) Such evidence creates a genuine dispute of fact about whether Bolender was meeting Defendants' legitimate business expectations. *See Sempowich v. Tactile Sys. Tech., Inc.*, 19 F.4th 643, 650–51 (4th Cir. 2021);[7] *DeBord v. Washington Cnty. Sch. Bd.*, 340 F. Supp. 2d 710, 713 (W.D. Va. 2004) (finding this element satisfied when the plaintiff presented evidence that she did not receive a negative job evaluation before she was terminated).

Bolender also satisfies the fourth element of her prima facie case because the record supports that a substantially younger employee replaced Bolender. In her deposition, Bolender testified that she was initially replaced by Nancy Patterson, an individual who was "a lot younger than her." (Bolender Dep. 187:6–16.) Defendants present no evidence to rebut that testimony. Defendants merely assert, without more, that Bolender did not provide a sufficient foundation for her statements related to this element. (*See* Reply Br. at 15–16.) This argument is a red herring. The nonmoving party does not need to produce evidence in a form that would be admissible at trial in order to avoid summary judgment. *See, e.g.*, *Celotex*, 477 U.S. at 324; *Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*, 790 F.3d 532, 538 (4th Cir. 2015). Instead, the crucial question on a motion for summary judgment is if there is a genuine issue

---

[7] Although *Sempowich* is a Title VII case, its analysis is relevant for an ADEA claim. *See Reynolds v. Am. Nat'l Red Cross*, 701 F.3d 143, 155 (4th Cir. 2012) (citations omitted) (discussing how courts apply case law for ADEA, Title VII, and ADA claims interchangeably).

of material fact, not "whether the parties have put their evidence in final form." *U.S. Dep't of Hous. & Urb. Dev. v. Cost Control Mktg. & Sales Mgmt. of Va., Inc.*, 64 F.3d 920, 926 n.8 (4th Cir. 1995); *cf.* 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2721 (4th ed. 2024) ("The court and the parties have great flexibility with regard to the evidence that may be used in a Rule 56 proceeding."). Bolender's deposition testimony creates a genuine issue of material fact about if she was replaced by a substantially younger employee, and her testimony about this could be admissible at trial.[8] As such, Bolender satisfies the fourth element and her prima facie case overall.[9] *See O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 313 (1996).

### 2. Nondiscriminatory Reason

Next, Defendants provide a legitimate, nondiscriminatory reason for terminating Bolender: according to them, she falsified a document. This satisfies the second part of the *McDonnell Douglas* framework, so the burden shifts back to Bolender to show that this asserted justification is a pretext for discrimination.

### 3. Pretext

Bolender satisfies the final element of the *McDonnel Douglas* framework because Defendants' disparate treatment of Gholson, as a similarly situated individual, and their deviation from Fresenius's progressive discipline policy create genuine disputes of fact about whether their nondiscriminatory reason for terminating Bolender is pretextual.

---

[8] Defendants, of course, will have recourse at trial if they believe Bolender fails to present admissible evidence that she was replaced by a substantially younger individual.

[9] Because Bolender carries her burden under the four elements of a prima facie case, the court does not address the parties' arguments about if Bolender has a prima facie case under a disparate-discipline theory.

The first way Bolender demonstrates pretext is through comparator evidence of a similarly-situated social worker, Gholson. In employment-discrimination cases, courts "routinely rely on comparator evidence when deciding whether an adverse employment action was driven by a discriminatory motive." *Laing v. Fed. Express Corp.*, 703 F.3d 713, 719 (4th Cir. 2013). "[E]specially relevant to a showing of pretext [is] evidence that other employees who were similarly situated to the plaintiff (but for the protected characteristic) were treated more favorably." *Cowgill v. First Data Techs., Inc.*, 41 F.4th 370, 381 (4th Cir. 2022) (cleaned up) (quoting *Laing*, 703 F.3d at 719). A comparison between employees does not need to be exactly the same, but "relevant considerations include whether the plaintiff and comparator 'dealt with the same supervisor, [were] subject to the same standards[,] and . . . engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" *Id.* (quoting *Haywood v. Locke*, 387 F. App'x 355, 359 (4th Cir. 2010)).

Here, Gholson is a relevant comparator to Bolender—in all material respects. The two women held the same position: social worker. (Bolender Dep. 21:5; Gholson Dep. 7:18.) They had the same supervisor: Foley. (Bolender Dep. 53:6–9; Gholson Dep. 9:4–7.) Neither had a prior disciplinary record. (Foley Dep. 50:20–51:5; Gholson Dep. 21:4–8.) And they engaged in similar conduct around the same time: incorrectly inputting information on a patient's transplant assessment after the patient died. But for the nearly sixty-year age difference between Bolender and Gholson, they were similarly situated.

To avoid that conclusion, Defendants ask the court to resolve a factual dispute in their favor. Defendants argue that Gholson is not a proper comparator because Bolender's

infraction was worse. Gholson's error was less severe, so their argument goes, because it occurred when she was providing remote coverage for another clinic, she had not received the August 2022 documentation training, and the patient who she entered an incorrect note for was not eligible for a transplant. (*See* Defs.' Br. at 19–21; Reply Br. at 17–20.) Aside from asking the court to usurp the jury's role, these arguments are unpersuasive at this stage. Gholson was performing a standard task when completing the transplant assessment remotely and had received frequent documentation training before she made her mistake. (*See* Gholson Dep. 8:13–9:21, 28:15–29:9.) Additionally, Bolender never participated in the August 2022 training, and her mistaken assessment was also on a patient who was not eligible for a transplant at the time of her error. (*See* Foley Dep. 73:7–74:17; Bolender Dep. 156:12–19.) In fact, when the evidence is viewed in Bolender's favor, the record supports that Gholson's conduct was materially worse than Bolender's. Gholson did not speak with anyone before filling out her erroneous assessment, while Bolender's mistaken assessment was based on information she received from a Fresenius nurse. (*Compare* Gholson Dep. 13:3–7, *with* Bolender Dep. 126:5–12, 148:6–12.) Gholson's documentation error also occurred more than a month after the patient died, whereas Bolender's occurred only nine days later. (*Compare* Foley Dep. 205:20–206:3, *with* Bolender Dep. 181:12–182:8.)

Despite the similarities between Gholson and Bolender—and Gholson's arguably worse conduct—Fresenius terminated Bolender but retained Gholson, providing her with counseling and retraining. That disparate treatment is enough for Bolender to satisfy the pretext step of the *McDonnell Douglas* standard at summary judgment. *See Cowgill*, 41 F.4th at 382; *see also Jennings v. Frostburg State Univ.*, 679 F. Supp. 3d 240, 279 (D. Md. 2023) (quoting

*Walker v. Johnson*, 798 F.3d 1085, 1092 (D.C. Cir. 2015)) ("A plaintiff may support an inference that the employer's stated reasons were pretextual, and the real reasons were prohibited discrimination or retaliation, by citing the employer's better treatment of similarly situated employees outside the plaintiff's protected group.").

Other evidence supports Bolender's pretext argument as well. Significantly, she did not receive any type of progressive discipline; her first and only reprimand was termination. Defendants' decision to terminate Bolender without any type of escalating punishment cuts squarely against their own comprehensive disciplinary guideline and their treatment of Gholson. Accordingly, a reasonable jury could rely on this evidence to infer that Defendants' proffered nondiscriminatory reason is false. *See Cowgill*, 41 F.4th at 383; *Linkous v. StellarOne Bank*, No. 7:12-cv-00229, 2013 WL 2423076, at *6 (W.D. Va. June 4, 2013). *But see Russell v. Harlow*, 771 F. App'x 206, 207–08 (4th Cir. 2019) (cleaned up) (stating that evidence of an employer's failure to follow its own internal procedures, on its own, does not show pretext unless the irregularity "directly and uniquely disadvantaged" an employee in a protected class).

The court also rejects Defendants' arguments that the same-actor inference and the same-protected-class inference foreclose a finding of pretext. (*See* Defs.' Br. at 18.) The same-actor inference is inapplicable here because Foley firing Bolender eight years after hiring her does not constitute the "relatively short time frame following the hiring" that supports the inference. *See Sempowich*, 19 F.4th at 653. On the same-protected-class inference, although Defendants correctly point out it is probative evidence that the decisionmakers who fired Bolender were also members of the ADEA's protected class, that evidence does not conclusively establish a lack of pretext. *See Rorie v. Bd. of Educ. of Charles Cnty.*, 653 F. Supp. 3d

217, 237 (D. Md. 2023). The decisionmakers who fired Bolender—Foley, Brown, and Campbell—although in the ADEA's protected class, were all more than 25 years younger than Bolender when she was fired. (*See* Defs.' Br. at 7, 18.) That wide age difference affords the inference less weight and would not preclude a jury from finding pretext in this case. *Cf. O'Connor*, 517 U.S. at 312–13 (instructing courts generally to analyze inferences in the age-discrimination context based on differences in individuals' ages, not by drawing a bright-line at who qualifies for protection under the ADEA).

In sum, when the evidence is viewed in the light most favorable to Bolender, she carries her burden at steps one and three of the *McDonnell Douglas* test. As such, the court will deny Defendants' motion for summary judgment on her ADEA claim.

## D. Damages

Finally, Defendants argue that Bolender's requests for punitive damages, back pay, and front pay should not go to a jury. The court disagrees.

### 1. Punitive Damages

In an employment discrimination case, punitive damages are allowed "when the plaintiff demonstrates that the defendant employer engaged in intentional discrimination with malice or with reckless indifference to the federally protected rights of the plaintiff." *Anderson v. G.D.C., Inc.*, 281 F.3d 452, 459 (4th Cir. 2002) (cleaned up). The inquiry focuses on the actor's mental state: "punitive damages are appropriate . . . when a person discriminates 'in the face of a perceived risk that [her] actions will violate federal law." *Id.* at 459–60 (quoting *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 535–36 (1999)).

Defendants assert that they cannot be held liable for punitive damages because they have a written non-discrimination policy. (Reply Br. at 21.) Although a written-policy supports an inference that the employer did not discriminate, it is plainly wrong to suggest that such a policy acts as a complete shield against punitive damages. *See Lowery v. Cir. City Stores, Inc.*, 206 F.3d 431, 446 (4th Cir. 2000); *E.E.O.C. v. Fed. Express Corp.*, 513 F.3d 360, 374 (4th Cir. 2008) ("Unfortunately for [the employer], the mere existence of an ADA compliance policy will not alone insulate an employer from punitive damages liability.").

Bolender's evidence creates a genuine dispute of material fact about whether Defendants, through their managers, discriminated against Bolender despite the risk that their actions violated the ADEA. When viewed in Bolender's favor, Foley, Brown, and Campbell's communications with HR related to her termination indicate attempts to manufacture a purported difference between Bolender's and Gholson's cases, limit liability through corporate formalities, and restrict the information available to Bolender in case she sued. (*See* Bost Decl. Ex. E; ECF No. 25-20.) A reasonable jury could infer from such evidence that Defendants' managers perceived the risk that firing Bolender violated federal age-discrimination law but decided to terminate her anyway. The question of punitive damages, therefore, must proceed to trial.

## 2.  Back Pay and Front Pay

Bolender's request for back pay and front pay must also survive summary judgment because the record reveals a material factual dispute about whether she mitigated these wage damages.

To limit Bolender's right to back pay and front pay, Defendants have the burden of showing she was not "reasonably diligent in seeking and accepting new employment substantially equivalent to that from which [she] was discharged." *E.E.O.C. v. Consol Energy, Inc.*, 860 F.3d 131, 148 (4th Cir. 2017) (citation omitted). A plaintiff's economic and personal circumstances, including her age, are relevant considerations for determining if she reasonably mitigated her wage damages. *See id.* at 149. Neither full-time employment nor employment in the same field is necessarily required, so long as the plaintiff did not act in bad faith by accepting a certain job. *See E.E.O.C. v. CTI Glob. Sols., Inc.*, 815 F. Supp. 2d 897, 912 (D. Md. 2011). At bottom, the question of whether a fired-employee reasonably mitigated her wage damages is "preeminently a question of fact" that must go to a jury. *See Consol Energy, Inc.*, 860 F.3d at 149; *Antekeier v. Lab'y Corp. of Am.*, 295 F. Supp. 3d 679, 689 (E.D. Va. 2018) (supporting, as Bolender correctly cites, the proposition that "[w]hether [a] plaintiff's efforts to mitigate her damages were sufficient is a question of fact for the jury").

In this matter, contrary to Defendants' bald assertion, Bolender presented ample evidence that she reasonably attempted to mitigate her wage damages, especially considering her age. Her efforts included working with an employment office and calling at least two companies per week to try to find a job. (Bolender Dep. 209:2–20.) She also applied to, and interviewed with, a number of non-dialysis companies, and even took a job at a jail before leaving because it did not meet her expectations. (*See id.* 208:11–216:4.) She eventually settled on working two part-time jobs with telehealth companies. (See *id.* 24:21–25:3, 26:16–21.) Defendants do not argue that Bolender acted in bad faith in accepting her current employment; they contend that she has not reasonably mitigated her damages because she is

only working part time, did not apply for work at other dialysis centers, and has not looked for new work since July 2023. (*See* Reply Br. at 20–21.) Defendants can make those arguments at trial, but they do not carry the day at summary judgment because determining the reasonableness of Bolender's efforts requires weighing and drawing inferences from disputed facts. That is the jury's function, not the court's, so Defendants' request to strike Bolender's claims for back pay and front pay will be denied. *See Anderson*, 477 U.S. at 255; *Antekeier*, 295 F. Supp. 3d at 689.

## IV.   CONCLUSION

For the foregoing reasons, the court will grant Defendants' motion for summary judgment as to Bolender's VHRA claim, but deny it in all other respects.

The Clerk is directed to forward a copy of this Memorandum Opinion and the accompanying Order to all counsel of record.

**ENTERED** this 24th day of June, 2024.

*/s/ Thomas T. Cullen*
HON. THOMAS T. CULLEN
UNITED STATES DISTRICT JUDGE